IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

HOLLY HILL MALL, LLC,                )
                                     )
            Plaintiff,               )
                                     )
        v.                           )        1:23-CV-547
                                     )
DUNHAM'S ATHLEISURE                  )
CORPORATION d/b/a DUNHAM'S           )
SPORTS,                              )
                                     )
            Defendant.               )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

In this action removed from state court, Plaintiff Holly Hill Mall, LLC ("Holly Hill") seeks damages for breach of contract and a declaration that its tenant, Defendant Dunham's Athleisure Corporation ("Dunham's"), is in default of the parties' lease agreement and that Holly Hill has the right to terminate the lease, re-enter the premises, remove Dunham's, and take such actions as are necessary to recover exclusive possession. (Doc. 8.) Dunham's denies liability and has filed a counterclaim that seeks a declaration that, because Holly Hill breached the co-tenancy provision of the lease, Dunham's has paid all rent due under the lease and is entitled to continue paying the reduced rent allowed under the co-tenancy provision for the remainder of its tenancy. (Doc. 11.)

A bench trial was held June 3, 2025, and the parties were

represented by counsel. Holly Hill called David Morton, its member-manager, and John Palmer, Dunham's Executive Vice President, General Counsel, and Secretary as witnesses. Dunham's also called Palmer as its only witness. At the close of Holly Hill's evidence, Dunham's moved for judgment as a matter of law on all claims pursuant to Federal Rule of Civil Procedure 50(a). The court reserved ruling. At the close of Dunham's evidence, it renewed its motion for judgment as a matter of law under Federal Rule of Civil Procedure 54(a), and Dunham's moved for judgment as a matter of law on its counterclaim. The court again reserved ruling on all claims.

Pursuant to Federal Rule of Civil Procedure 52(a), the court enters the following findings of fact — based upon its evaluation of the evidence, including the credibility of the witnesses, and the inferences that the court has found reasonable to draw therefrom — and conclusions of law. The court finds the testimony of Palmer and Morton to be credible to the extent noted herein. To the extent any factual statement is contained in the conclusions of law, it is deemed a finding of fact as well.

## I. FINDINGS OF FACT

1. Holly Hill Mall is a shopping mall known as Holly Hill Mall & Business Center ("Shopping Center") located at 309 Huffman Mill Road, Unit 100, Burlington, North Carolina 27215.

2. Dunham's is a retail sporting goods store with

2

approximately 267 locations in more than twenty states.

3. Morton is a member-manager of Holly Hill.

4. Palmer is the Executive Vice President, General Counsel, and Secretary of Dunham's.

5. In at least November 2010, Holly Hill and Dunham's began negotiating a lease for Dunham's to rent retail space from Holly Hill. On November 12, 2010, Paul Oertel, an attorney, sent a letter to Palmer on behalf of Holly Hill, addressing several "details of our proposal for your consideration."[1] (Trial Exhibit ("Tr. Ex.") J-3.) Among the items was one listed as number 6 and titled "Co-Tenancy," which stated:

> Reduce the space to 40% of the total net leasable space in the Mall, including the space which is the subject of the lease. The termination and or rent reduction clause will not become available until 3 years after the rent commencement date. Rent reduction would be the greater of 2.5% or one half rent.

(Id.)

6. On October 19, 2011, Palmer sent Morton a draft of a proposed lease. Section 18.01 of the lease, entitled "Co-Tenancy," provided:

> Tenant has entered into this Lease based on the representation by Landlord that Co-Tenants, Sears and sixty percent (60%) of the small shop space (herein, "Co-Tenants"[)] are open for business in the Shopping Center in which the Demised Premises is located. If at

---

[1] The first line of Oertel's letter stated, "Thank you very much for your recent Letter of Intent." Palmer testified that ordinarily Dunham's would send a letter of intent and it would include the major lease terms, including a co-tenancy clause. However, no one testified that a letter of intent was actually exchanged and, if so, what it included.

any time during the term of this Lease and any extensions thereof, Landlord or Co-Tenant terminate its lease, vacate the Shopping Center or cease to conduct its operation in the Shopping Center, and is not replaced with a retail tenant of the same size within one hundred eighty (180) days of such event or if sixty percent (60%) of the small shop space is not occupied by retail tenants, Tenant shall have the right, at its option, to terminate and cancel this Lease upon giving Landlord thirty (30) days written notice of termination, and upon such termination and cancellation, Tenant shall be automatically relieved of and from any and all liabilities and obligations under this Lease. Furthermore, Tenant's only obligation with respect to Gross Rent shall be the payment of the lesser of (i) one-half (½) the Base/Gross Rent (with no reduction to the Percentage Rent Breakpoint) or (ii) two percent (2%) of Tenant's gross sales. Tenant's right under this Article shall not be exclusive of any other rights or remedies that Tenant may have under this Lease.

(Tr. Ex. J-4.)

7.  On December 23, 2011, Palmer sent Morton a final draft of the lease.  Section 18.01 of this draft was identical to the October 2011 draft, except that the small shop space percentage threshold was reduced from sixty to fifty percent.

8.  Dunham's and Holly Hill executed the lease on January 13, 2012.  The initial lease term was seven years.  The lease also gave Dunham's the option to extend the lease term for four periods of five years each.

9.  The lease defined Demised Premises as "the Shopping Center . . . known as Holly Hill Mall & Business Center located at 309 Huffman Mill Road, Unit 100, Burlington, North Carolina 27215." (Tr. Ex. J-1 § 1.01.)

4

10.  Section 18.01 of the lease provided:

> Tenant has entered into this Lease based on the representation by Landlord that Co-Tenants, Sears and fifty percent (50%) of the small shop space (herein, "Co-Tenants"[)] are open for business in the Shopping Center in which the Demised Promises is located. If at any time during the term of this Lease and any extensions thereof, Landlord or Co-tenant terminate its lease, vacate the Shopping Center or cease to conduct its operation in the Shopping Center, and is not replaced with a retail tenant of the same size within one hundred eighty (180) days of such event or if fifty percent (50%) of the small shop space is not occupied by retail tenants, Tenant shall have the right, at its option, to terminate and cancel this Lease upon giving Landlord thirty (30) days written notice of termination, and upon such termination and cancellation, Tenant shall automatically be relieved of and from any and all liabilities and obligations under this Lease. Furthermore, Tenant's only obligation with respect to Gross Rent shall be the payment of the lesser of (i) one-half (½) of the Base/Gross Rent (with no reduction to the Percentage Rent Breakpoint) or (ii) two percent (2%) of Tenant's gross sales. Tenant's right under this Article shall not be exclusive of any other rights or remedies that Tenant may have under this Lease.

(Id. § 18.01.)

11.  The lease provided that Dunham's would pay Holly Hill gross rent on a monthly basis and percentage rent, equal to a stated percentage of gross sales, paid on an annual basis.

12.  At the time the parties entered into the lease, a Sears store was located in the Shopping Center.  Sears occupied 65,000 square feet.

13.  On September 29, 2017, Morton emailed Palmer, informing him that Holly Hill was "pushing the Sears building down and building a brand new Publix Grocery Store."  Morton also stated

5

that Holly Hill would be "pushing the Sears Auto Center down and building high end shops and restaurants." (Tr. Ex. J-7.)

14.   On October 16, 2018, Morton emailed Palmer, stating "Publix is closing on the Sears in December.  They are tearing it down and building a new Publix. And where Sears Auto is, there [sic] building a new Sheetz." (Tr. Ex. J-8.)

15.   On December 26, 2018, Morton emailed Palmer and told him that "Publix is closing on the Sears building in January" and that new "projects" were planned for the Shopping Center. (Tr. Ex. J-9.)

16.   On January 7, 2019, Morton emailed Palmer and asked if Dunham's was planning to renew its lease and again stated, "We are selling our Sears end of the mall to Publix. . . . They are closing that deal this week." (Tr. Ex. J-10.)

17.   On February 1, 2019, Morton emailed Palmer and confirmed that Dunham's wanted to renew its lease and informed him that Holly Hill had "just closed on the new deal with Publix Grocery Store." (Tr. Ex. J-11.)

18.   On February 11, 2019, Holly Hill sold the parcel of land on which Sears was located to Church Street Commons Realty, LLC, a developer.  The new development is known as Church Street Commons.

19.   On September 25, 2019, Holly Hill and Dunham's executed the first amendment to the lease.  (Tr. Ex. J-2.)  The first

6

amendment reduced the gross rent due in each option period. Holly Hill also agreed to assume the full cost of maintaining the HVAC system.

20. Sears vacated the Shopping Center in February 2020.

21. In August 2020, Dunham's began paying reduced rent based on the formula in Section 18.01 of the lease.

22. On August 26, 2020, Morton emailed Palmer and asked that Dunham's "[p]lease pay [regular] rent." (Tr. Ex. J-21.) Morton explained that reducing its rent could result in financial problems for Holly Hill.

23. On September 11, 2020, Morton emailed Palmer, writing, "Please do not reduce your rent." (Tr. Ex. J-25.) Morton stated that reducing Dunham's rent would cause Holly Hill financial trouble, and he updated Palmer on the plans for the new Publix, explaining that construction would begin the next month.

24. On October 7, 2020, Morton emailed Palmer and asked Dunham's not to reduce rent and stated that Sears was being replaced with a Publix store. (Tr. Ex. J-26.)

25. On October 8, 2020, Palmer explained in an email to Morton that Dunham's was exercising its right to reduce its rent under Section 18.01 of the lease. (Tr. Ex. J-28.)

26. In November 2020, Morton emailed Palmer twice, stating that reduced rent was causing financial strain on the mall and, as a result, Holly Hill was showing the mall to buyers. (Tr. Exs. J-

7

29, J-30.)

27. On March 9, 2021, Morton emailed Palmer seeking "to confirm Dunham's Sports [would] go back to paying full rent when Publix [opened]." (Tr. Ex. J-31.) Morton made no contention that Dunham's could only pay reduced rent under Section 18.01 of the lease if it terminated and canceled the lease.

28. On August 20, 2021, Morton emailed Palmer stating, "Publix will be open in the next 90 days. We do expect the rent to go back to normal rent when they open." (Tr. Ex. J-33.)

29. At some point prior to Publix opening, Palmer received a marketing packet on the new Publix store, which included a map of the Shopping Center. Based on this map, Palmer formed the belief that Publix would be attached to the Shopping Center.

30. Publix, which is located in the Church Street Commons, opened on December 8, 2021. The Publix store is 49,098 square feet. It is in a separate building from Holly Hill's Shopping Center; the two are separated by an alley that contains receiving for Publix and the small shop space in Church Street Commons as well as parking.

31. At the northern end of the Shopping Center there is a large "Publix" sign above the exit.

32. Other retail tenants in Church Street Commons opened after Publix, and each was smaller than Publix.

33. On January 4, 2022, Jacob Campbell, an attorney writing

8

on behalf of Dunham's, sent a letter to Holly Hill explaining that Holly Hill was incorrect in thinking that the opening of the Publix had cured the violation of the co-tenancy clause, Section 18.01. Rather, Campbell explained, the violation had not been cured and, because it had not been cured within the 180-day time constraint set out in Section 18.01, the violation could not be cured. He asserted that Dunham's was entitled to continue paying reduced rent "throughout the remainder of its tenancy at the Shopping Center." (Tr. Ex. J-34.)

34. On January 21, 2022, F. Paul Koonts, an attorney writing on behalf of Holly Hill, sent a letter to Dunham's stating that the co-tenancy violation, which had occurred due to the closure of Sears, had been cured and, therefore, rent would return to the normal rate. The letter did not make any claim that rent should not have been reduced because Dunham's failed to terminate and cancel the lease. (Tr. Ex. J-35.)

35. On January 31, 2022, Darin LeBeau, Vice President and Assistant General Counsel for Dunham's, responded to Mr. Koonts, reiterating that the co-tenancy violation had not been cured and contending that it could no longer be cured because 180 days had passed since Sears had closed. He explained that the violation was not cured because Publix is located in a separate shopping center and is smaller than Sears. (Tr. Ex. J-36.)

36. On September 14, 2022, Morton emailed Palmer stating,

9

"Our attorney wants us to file bankruptcy and petition the court not to honor Dunham's Sports [sic] lease because it is not fair." (Tr. Ex. J-39.)  He added, "Be compassionate please," and asked Palmer to "[p]lease help."  (Id.)

37.  In May 2023, W. Craig Turner from the Vernon Law firm sent a letter to Dunham's stating that his firm represented Holly Hill and that Dunham's was in arrears.  The letter made a demand for payment.  (Tr. Ex. 40.)

38. Holly Hill concedes that Publix occupies just over 49,000 square feet, which is smaller than Sears's 65,000 square feet. Holly Hill conceded at trial, and the court finds, that Publix does not satisfy the co-tenancy provision for the replacement of Sears.

## II.  CONCLUSIONS OF LAW

1.  The court has subject matter jurisdiction over this action based on the diversity of citizenship of the parties.  28 U.S.C. § 1332(a)(1).  The citizenship of an unincorporated association is determined by the citizenship of its individual members.  Americold Realty Tr. v. Conagra Foods, Inc., 577 U.S. 378, 381 (2016) (citations omitted); Gen. Tech. Applications, Inc. v. Exro Ltda, 388 F.3d 114, 121 (4th Cir. 2004).  Holly Hill is a limited liability company with four members, each of which is a limited liability company.  (Doc. 8 ¶ 2; Doc. 9 at 2.)  Each of those limited liability companies in turn has a sole individual

10

member.  (Doc. 8 ¶ 2; Doc. 9 at 3.)  Three of those individual members are residents of North Carolina, and one is a resident of Puerto Rico.  (Doc. 8 ¶ 2; Doc. 9 at 3.)  Dunham's Sports is incorporated in Delaware and has its principal place of business in Michigan.  (Doc. 8 ¶ 4.)  Holly Hill's claims allege damages greater than $75,000.

2.  The lease provides that it is governed by North Carolina law.  The parties agree, and the court finds, that North Carolina law applies in this case.

3.  A breach of contract claim requires the plaintiff to demonstrate the "(1) existence of a valid contract, and (2) breach of the terms of [the] contract."  Wells Fargo Ins. Servs. USA, Inc. v. Link, 827 S.E.2d 458, 472 (N.C. 2019) (quoting McLamb v. T.P. Inc., 619 S.E.2d 577, 580 (N.C. Ct. App. 2005)).  To have a valid contract, there must be "an agreement based on a meeting of the minds and sufficient consideration."  Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc., 694 F. Supp. 3d 625, 680 (M.D.N.C. 2023) (citing Creech ex rel. Creech v. Melnik, 556 S.E.2d 587, 591 (N.C. Ct. App. 2001)).

4.  The court concludes, and neither party contests, that the lease is a valid contract and governs the relationship between Holly Hill and Dunham's.

5.  "When interpreting a contract, the Court should presume that the words of the agreement were deliberately selected and

11

[the words should] be given their plain meaning." <u>Value Health Sols., Inc. v. Pharm. Rsch. Assocs., Inc.,</u> 891 S.E.2d 100, 114 (N.C. 2023). "The court is to interpret a contract according to the intent of the parties to the contract, unless such intent is contrary to law." <u>Botts v. Tibbens</u>, 754 S.E.2d 708, 711 (N.C. Ct. App. 2014) (quoting <u>Williams v. Habul</u>, 724 S.E.2d 104, 111 (N.C. Ct. App. 2012)). The contract is to be construed as a whole. <u>Int'l Paper Co. v. Corporex Constructors, Inc.,</u> 385 S.E.2d 553, 555 (N.C. Ct. App. 1989). Terms of the contract will be the "harmoniously construed." <u>WakeMed v. Surgical Care Affiliates, LLC,</u> 778 S.E.2d 308, 312 (N.C. Ct. App. 2015). And "[i]ndividual clauses are to be considered in context." <u>Int'l Paper</u>, 385 S.E.2d at 555-56.

6. "[O]rdinary words are given their ordinary meaning" and "are to be taken and understood in their plain, ordinary and popular sense." <u>Badin Shores Resort Owners Ass'n, Inc. v. Handy Sanitary Dist.,</u> 811 S.E.2d 198, 208 (2018) (citation omitted). "[A]n interpretation which gives a reasonable meaning to all provisions of a contract will be preferred to one which leaves a portion of the writing useless or superfluous." <u>Int'l Paper</u>, 385 S.E.2d at 556 (citing <u>Lowder, Inc. v. Highway Comm'n</u>, 217 S.E.2d 682, <u>cert. denied</u>, 218 S.E.2d 467 (1975)).

7. If the contract language is clear and unambiguous, "then construction of the agreement is a matter of law for the court."

RME Mgmt., LLC v. Chapel H.O.M. Assocs., LLC, 795 S.E.2d 641, 645 (N.C. Ct. App. 2017) (quoting Whirlpool Corp. v. Dailey Constr., Inc., 429 S.E.2d 748, 751 (1993)).  However, if the contract is ambiguous, then interpretation is a question of fact, and the factfinder will consider extrinsic evidence in determining the meaning of the contract.  Id.; Speedway Motorsports Int'l Ltd. v. Bronwen Energy Trading, Ltd., 707 S.E.2d 385, 391 (N.C. Ct. App. 2011).

8.    "North Carolina courts do not find ambiguity in contractual language simply because the parties dispute its meaning."  SAS Inst., Inc. v. World Programming Ltd., 874 F.3d 370, 380 (4th Cir. 2017) (citing Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co., 172 S.E.2d 518, 522 (1970)).  "An ambiguity exists in a contract when either the meaning of the words or the effect of provisions is uncertain or capable of several reasonable interpretations."  Galloway v. Snell, 885 S.E.2d 834, 836 (N.C. 2023).

9.    "[Courts] may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein."  Johnston v. Pyka, 872 S.E.2d 828, 834 (N.C. Ct. App. 2022) (quoting Hodgin v. Brighton, 674 S.E.2d 444, 446 (N.C. Ct. App. 2009)) (quotation marks and citations omitted in original).  Nor can the court add terms to the contract.  Wachovia Mortg. Co. v. Autry-Barker-

13

Spurrier Real Est., Inc., 249 S.E.2d 727, 731, aff'd, 256 S.E.2d 688 (1979) (citing cases).

10. "[T]he parties' construction of the contract after its execution" is some evidence of the parties' intent. Lagies v. Lyers, 542 S.E.2d 336, 342 (N.C. Ct. App. 2001) (citing Patterson v. Taylor, 535 S.E.2d 374 (N.C. 2000)). "Evidence of the parties' purposes in entering a contract, and their conduct after the agreement, is some evidence of their intent." Hardin v. Belmont Textile Mach. Co., No. 3:05-CV-492, 2010 WL 2650911, at *3 (W.D.N.C. June 30, 2010) (citing Joyner v. Adams, 361 S.E.2d 902, 904 (N.C. Ct. App. 1987)).

11. The court must "determine the weight and credibility" of the extrinsic evidence it considers. Lagies, 542 S.E.2d at 342 (citing Patterson, 535 S.E.2d at 378).

12. Ordinarily, ambiguous contract language is construed against the drafter. Wells Fargo Ins. Servs., 827 S.E.2d at 469. However, North Carolina courts excuse this rule where contracts are "negotiated between two sophisticated entities with each side proposing various terms for possible inclusion into the final agreement." Innovare, LTD v. Sciteck Diagnostics, Inc., No. 21-CVS-2180, 2024 WL 2783904, at *14 (N.C. Super. Ct. May 29, 2024). Both Holly Hill and Dunham's were sophisticated parties: Holly Hill is the owner of the Shopping Center and lessor to many retail tenants, and Dunham's is a large retail tenant with 267 locations

14

nationwide. In addition, both parties had the advice of counsel during phases of the negotiations, evidenced by Palmer's involvement for Dunham's and the 2010 letter from Oertel representing Holly Hill. Both parties also suggested and negotiated terms favorable to themselves in the lease. Moreover, the parties agreed in Section 20.16 of the lease that the "normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party[] shall not be employed." Therefore, the court does not apply the conventional rule that ambiguities are to be construed against the drafter of the lease.

13.   Holly Hill's interpretation of Section 18.01 of the lease, as relevant here, is as follows:  Dunham's has the right to terminate the lease if Sears vacates the Shopping Center and is not replaced with a retail tenant of the same size within 180 days. Upon giving the requisite thirty days' notice of its termination, Dunham's would receive reduced rent while in the process of closing its store until it vacated the Shopping Center.  In the absence of providing such notice of termination, however, Holly Hill contends that Dunham's may not take advantage of Section 18.01's reduced rent provision.

14. Dunham's construes the lease as follows:  if Sears leaves and is not replaced within 180 days, Dunham's has the option thereafter to either terminate the lease or to pay reduced rent for the remainder of its tenancy, including any additional periods

15

of tenancy should Dunham's exercise its renewal options.

15. This court (per Judge Loretta C. Biggs) denied Dunham's motions for judgment on the pleadings and for summary judgment, finding that Section 18.01 of the lease was ambiguous. (Docs. 58, 59.) Section 18.01 plainly gives Dunham's at least the right to terminate its lease if Sears vacates the Shopping Center and is not replaced within 180 days. Whether it provides Dunham's an additional and independent right to reduce rent for the balance of the lease or only a right to reduce rent while it is in the process of closing its store, however, is ambiguous. The structure of Section 18.01 and the use of the word "furthermore" contribute to this ambiguity. The plain and ordinary meaning of "furthermore" is "in addition." See, e.g., Furthermore, Merriam Webster, https://www.merriam-webster.com/dictionary/furthermore (last visited July 8, 2025). "Furthermore" is typically used to introduce an additional point or argument after a prior and related point. Therefore, as used in Section 18.01, a plain meaning of "furthermore" indicates that in addition to its right to terminate, Dunham's has a right to reduced rent. But whether the right to reduced rent exists only in the months following the loss of Sears or the required percentage of co-tenancy small shops until the tenant vacates the premises, or rather for the duration of the lease and any renewals, is not specified. This is made ambiguous, as well, by Section 18.01's characterization of Dunham's right

16

upon violation of the clause as one "right," not rights.

16. Because Section 18.01 is susceptible to conflicting interpretations, the court considers the parties' extrinsic evidence.

17. The communications between the parties before the formation of the lease include the 2010 letter from Oertel, an email from Palmer to Morton sending a draft lease, and another email from Palmer sending Morton the final draft of the lease. In the 2010 letter, Oertel referred to the co-tenancy clause as "[t]he termination and or rent reduction clause." This letter was sent in November 2010, over a year before the lease was signed, and Oertel's proposed terms are not clear. Indeed, "and or" is written without any punctuation to suggest that the use of both words was intentional. For these reasons, the letter is not strong evidence that Holly Hill's interpretation is incorrect, as Dunham's argues, but is some evidence that Holly Hill understood Section 18.01 to allow Dunham's to either terminate its lease or pay reduced rent under certain conditions.

18. The draft leases provide even less insight into the parties' intent: they include the same language and structure in Section 18.01 as the lease executed by the parties. The only change was to reduce the percentage of small shop space that needed to be filled to avoid triggering the clause from sixty to fifty percent.

19.    The parties' conduct and communications after Sears vacated the Shopping Center are more informative.   From August through November 2020 and again in September 2022, Morton sent Palmer a number of communications pleading with him to have Dunham's return to paying the regular rent amount.   Morton never once stated that Dunham's was in breach of the terms of the lease or that rent reduction was not a remedy available to Dunham's. Rather, he asked for Dunham's to pay its regular rent because the reduced rent was causing financial strain on Holly Hill.   Morton, in an effort to avoid litigation, expressed the hope that the parties could resolve the dispute without having to address the specific terms of the co-tenancy clause.

20.    Communications from Dunham's, by contrast, routinely referenced Section 18.01 as providing it the right to reduced rent after 180 days passed from the time Sears vacated the Shopping Center.  (E.g., Tr. Exs. J-28, J-34, J-36.)

21.    In March and August of 2021, Morton sent two emails to Dunham's stating that he expected Dunham's to return to paying regular rent once Publix had opened and that the co-tenancy violation thus had been cured.   (See Tr. Exs. J-31, J-33.)   Each of these emails was sent long after 180 days following Sears's vacating the Shopping Center.   This is evidence that Morton believed that Holly Hill could cure the co-tenancy violation at any time and reinstate Dunham's obligation to pay full rent.

18

22. The parties' emails from January 2022 demonstrate that Holly Hill persisted in its view that the violation could be cured, even years after Sears had closed. (See Tr. Ex. J-34, J-35, J-36.) January 2022 was also the first time Dunham's expressed its view that the co-tenancy violation could never be cured once 180 days had passed and that Dunham's had a right to pay reduced rent throughout the remainder of its tenancy despite earlier communications between the parties spanning approximately the prior eighteen months. (Tr. Exs. J-34, J-36.)

23. In Morton's September 2022 email to Palmer, Morton expressed that Holly Hill's attorney advised that the lease was unfair. If Morton had thought Dunham's was in breach, he likely would not have said the lease was unfair, but rather that Dunham's actions were unfair as it was violating the terms of the lease. Therefore, it's likely that Holly Hill thought the lease permitted Dunham's to reduce its rent without terminating its lease.

24. At trial, Palmer characterized Dunham's right under the co-tenancy clause as a "remedy." The parties suggested that the purpose of Section 18.01 was to remedy a reduction in the value of Dunham's lease, which would occur upon Sears vacating the Shopping Center or the small shop space being sufficiently vacant, with a reduction in rent and a right to terminate. Yet, neither parties' suggested interpretation achieves this purpose. Holly Hill's interpretation would result in a substantial loss to Dunham's and

would not simply provide a remedy. The ability to terminate does itself provide some protection to Dunham's. Dunham's' interpretation, on the other hand, results in a windfall for itself. Upon triggering the co-tenancy provision by either the passage of 180 days after Sears vacates or the small shop space occupancy dipping below fifty percent, Dunham's would be able to pay dramatically reduced rent for the remainder of its tenancy, including its lease terms under its four renewal options. Even if Sears were replaced 181 days after it vacated the Shopping Center or if the small shop space fell below fifty percent occupancy for a single day, Dunham's' proposed construction of the section would result in its paying reduced rent for decades. That is no remedy. Indeed, after the violation is cured, there is nothing to be remedied. There is simply insufficient evidence that the parties intended that result.

25. Rather, based on the evidence presented, the court finds that the parties intended that Section 18.01 permits Dunham's to terminate its lease if Sears vacates the Shopping Center and is not replaced within 180 days, and to pay reduced rent thereafter while the co-tenancy violation occurs. The structure of Section 18.01 supports this interpretation. It first sets out a triggering event: Sears vacates and is not replaced within 180 days or the small shop space falls below fifty percent occupancy. Then, Dunham's can terminate the lease and pay reduced rent until it

20

leaves, or it can continue with the lease and pay reduced rent for the duration of the failure to satisfy the co-tenancy occupancy requirement. Dunham's has not provided persuasive evidence that the parties intended that any period of reduced rent would persist after the co-tenancy requirement was satisfied. Rather, the 180 days was intended to operate as a grace period for Holly Hill to cure the violation, during which Dunham's would have no right to terminate the lease.[2] This interpretation is consistent with the parties' conduct, especially that of Holly Hill, after Sears vacated the Shopping Center. Holly Hill repeatedly indicated that it believed it could cure the violation, even after 180 days had passed. And not until 2022 did Dunham's express its view that cure was unavailable after the 180-day period had passed. This interpretation is further consistent with the 2010 letter from Oertel, referring to the "termination and or rent reduction clause."

26. The court concludes that the occupancy by the co-tenants is a condition precedent and not a condition subsequent, as argued by Holly Hill. "A condition precedent is an event which must occur before a contractual right arises[.]" Handy Sanitary Dist. v. Badin Shores Resort Owners Ass'n, Inc., 737 S.E.2d 795, 800 (N.C.

---

[2] Neither party has argued whether Dunham's maintains the right to terminate the lease if the co-tenancy violation is cured after the passage of 180 days. But that is academic, as no facts were presented that would raise that question.

21

Ct. App. 2013) (quoting In re Foreclosure of Goforth Props., Inc., 432 S.E.2d 855, 859 (N.C. 1993)). Section 18.01 begins with the statement, "Tenant has entered into this Lease based on the representation by Landlord that Co-Tenants, Sears and fifty percent (50%) of the small shop space . . . are open for business in the Shopping Center in which the Demised Premises is located." (Tr. Ex. J-1 at 15.) This clearly conditions the promise to pay full rent on the co-tenancy clause being fulfilled, as Dunham's argued at trial. See Balogh Assocs. VII LLC v. Dick's Sporting Goods, Inc., No. 1:20CV872, 2022 WL 4624827, at *10 (M.D.N.C. Sept. 30, 2022) (finding co-tenancy provision to be condition precedent); Sun Valley Ltd. V. Galyan's Trading Co., No. 13-13641, 2014 WL 1030956, at *7 (E.D. Mich. Mar. 17, 2014) (same).

27. The court's interpretation of Section 18.01 is consistent with its conclusion that the co-tenancy clause creates a condition precedent. The contractual right to receive full rent arises upon satisfaction of the occupancy requirements set out as to co-tenancy, and if those requirements are not satisfied, Holly Hill is instead only entitled to reduced rent. Dunham's interpretation would result in the contractual right of full rent being unavailable even if the condition was satisfied. This is inconsistent with the occupancy requirement of the co-tenancy being the condition precedent. The court's conclusion is also consistent with the three cases Dunham's cited in its trial brief

22

in support of its claim. (Doc. 83 at 20-21.) While each admittedly turned on its own facts, in each of the three cases the court recognized that the co-tenancy clause permitted the tenant to pay reduced rent only for duration of the co-tenancy violation. See Balogh Assocs. VII LLC, 2022 WL 4624827, at *12; Boca Park Marketplace Syndications Grp., LLC v. Ross Dress for Less, Inc., No. 2:16-cv-01197, 2019 WL 2563814, at *3-4 (D. Nev. June 20, 2019); Sun Valley Ltd., 2014 WL 1030956, at *2, 8. Dunham's has not pointed to any case where a co-tenancy clause was found to permit a tenant to pay reduced rent in perpetuity even after a co-tenancy violation had been cured (if no right to cancel was exercised).

28. Holly Hill has not cured the violation of the co-tenancy clause that occurred in August 2020. Publix is not the same size as Sears; it is considerably smaller. Publix is also located in a different area separated from the Shopping Center by an alley and, therefore, is not "open for business in the Shopping Center in which [Holly Hill Mall] is located." (Tr. Ex. J-1 at 15.) Indeed, at trial and contrary to its position in prior communications with Dunham's, Holly Hill conceded that the co-tenancy violation had not been cured.

29. At trial, Holly Hill argued that Section 18.01 created an unenforceable penalty. The court rejects this contention. A penalty provision is a sum a party is obligated to pay if it

23

breaches a contract and is intended "as a punishment, the threat of which is designed to prevent the breach." City of Kinston v. Suddreth, 146 S.E.2d 660, 662 (N.C. 1966) (citation omitted). As explained above, Section 18.01 creates a valid condition precedent. Moreover, the court's conclusion as to the meaning of Section 18.01 differs from Dunham's suggested interpretation, which would have allowed Dunham to pay reduced rent for the remainder of its tenancy with no possibility for Holly Hill to cure. The court's reading gives meaning to the purpose of a co-tenancy provision and allows Holly Hill to cure. It is thus not a punishment for Holly Hill but a remedy for Dunham's to protect it from the loss it may incur if the co-tenancy clause is violated.

30. While not explicitly argued at trial, Holly Hill suggested that it was fraudulently induced into executing the first amendment to the lease because Dunham's knew at the time that it planned to pay reduced rent but did not disclose this, and instead negotiated terms even more favorable to Dunham's. The court rejects this argument. This claim was not alleged in the complaint. Moreover, the evidence nevertheless fails to support it. "The essential elements of fraud [in the inducement] are: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." Ward v. Fogel, 768 S.E.2d 292, 301 (N.C. Ct. App.

24

2014) (quoting <u>Media Network, Inc. v. Long Haymes Carr, Inc.</u>, 678 S.E.2d 671, 684 (N.C. Ct. App. 2009)). The evidence at trial showed that the first amendment to the lease was executed on September 25, 2019. At this time, Palmer had been told by Morton that Sears was closing and being replaced by Publix. However, Palmer did not know how large the Publix would be and had no reason to believe that it would not be attached to the Shopping Center. Therefore, he could not have known that Publix would not have satisfied the co-tenancy requirement under Section 18.01. In any case, Holly Hill was as aware of the contents of its lease as was Dunham's. Holly Hill thus has not shown that Palmer concealed a material fact or acted with the intent to deceive.

31. In its trial brief, Holly Hill argued that the defenses of estoppel and frustration of purpose applied to this case. It did not argue these defenses at trial and did not suggest conclusions of law with respect to these defenses. (<u>See</u> Doc. 77.) In addition, Holly Hill raised several defenses in its answer to Dunham's counterclaim that were not raised at trial. These defenses are deemed waived. In any event, and alternatively, the court finds that the evidence at trial did not support them.

32. Finally, Holly Hill contends that permitting Dunham's to continue to pay reduced rent pursuant to the co-tenancy provision is unfair because it causes Holly Hill financial hardship. However, as Dunham's' evidence at trial demonstrated, it was Holly

25

Hill who decided – rather than to find a lessee to meet the co-tenancy requirement - to sell the parcel upon which the Sears store previously stood to a third party, Church Street Commons Realty, LLC, for $4.5 million. (Tr. Ex. J-56.) That party in turn apparently leased the space to Publix and permitted the store to be constructed separately from the Shopping Center. The sale proceeds were distributed to the members of Holly Hill, including Morton. Therefore, to the extent Holly Hill contends the reduced rent of the co-tenancy provision causes it financial distress, it is a result of its decision to sell the parcel, as to which it benefitted financially.

33. The court has considered all arguments raised by the parties at trial, and to the extent not addressed herein, finds them unpersuasive.

34. The court therefore finds that Holly Hill has not demonstrated, by a preponderance of the evidence, that Dunham's has breached the lease. Holly Hill's claim for breach of contract (Claim 1) is therefore DENIED, as it has not demonstrated that it cured the violation of the co-tenancy provision, Section 18.01. Similarly, Holly Hill has failed to demonstrate, by a preponderance of the evidence, that Dunham's is in default. Holly Hill's claim for a judgment declaring that it has a right to terminate the lease, re-enter the premises and take possession, remove all persons, and recover possession; that monthly gross rents are due

26

at the full lease rate ($28,107.81); and all other relief sought (Claim II) is DENIED.

35.   The court finds that, because Holly Hill has failed to demonstrate that Dunham's has breached the lease, Dunham's' counterclaim seeking a declaration that it "has paid all rent due under the Lease to date" is therefore DENIED as moot.  The court further finds that Dunham's has demonstrated by a preponderance of the evidence that it is entitled to a judgment declaring that "pursuant to Section 18.01 of the Lease, and for the duration of the first Renewal Option term and for any subsequent Renewal Option term, the amount of Gross Rent due is the lesser of (i) one-half (1/2) of the Base/Gross Rent (with no reduction to the Percentage Rent Breakpoint) or (ii) two percent (2%) of Tenant's gross sales" is GRANTED but only while any co-tenancy violation remains uncured. Dunham's has failed to demonstrate, by a preponderance of the evidence, that it is entitled to such reduced rent per Section 18.01 if the co-tenancy provision is cured, and in that respect Dunham's' counterclaim is DENIED as being contrary to the terms of Section 18.01.

## III. CONCLUSION

For the reasons stated,

IT IS ORDERED that Holly Hill's claims for breach of contract (Count 1) and declaratory judgment (Count 2) are DENIED.

27

IT IS FURTHER ORDERED that Dunham's counterclaim seeking a declaration that it has paid all rents due to date is DENIED as MOOT.

IT IS FURTHER ORDERED that Dunham's counterclaim seeking a declaration that "pursuant to Section 18.01 of the Lease, and for the duration of the first Renewal Option term and for any subsequent Renewal Option term, the amount of Gross Rent due is the lesser of (i) one-half (1/2) of the Base/Gross Rent (with no reduction to the Percentage Rent Breakpoint) or (ii) two percent (2%) of Tenant's gross sales" is GRANTED only to the extent any co-tenancy violation remains uncured and is otherwise DENIED.


                                    /s/   Thomas D. Schroeder
                                    United States District Judge

July 11, 2025